## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| QVC, INC.,<br><br>       Plaintiff,<br><br>     v.<br><br>RESULTLY, LLC, ILYA BEYRAK (AN INDIVIDUAL) and VIGLINK, INC.,<br><br>       Defendants. | Civil Action No.: 2:14-cv-6714- WB<br><br>**JURY TRIAL DEMANDED**<br><br>**AMENDED COMPLAINT** |

Plaintiff, QVC, Inc. ("QVC"), by and through its attorneys, and for its Amended Complaint against Defendants, Resultly, LLC ("Resultly"), Ilya Beyrak ("Beyrak"), and VigLink, Inc. ("VigLink") (collectively, "Defendants"), states:

## INTRODUCTION

1. On or about May 9 through May 11, 2014, a principal of Defendant Resultly or an employee of Resultly under the control and direction of Resultly transmitted computer code in the form of a robot web crawling program ("Program") that excessively crawled QVC's retail website www.qvc.com, causing the Program to overload QVC's website and network.

2. QVC uses its retail website to sell products to its customers. QVC customers browse and purchase QVC products through QVC's website and QVC obtains a substantial amount of its business through its website sales.

3. As a result of Defendant Resultly's transmission of its Program on May 9–11, 2014, QVC's website was unable to function normally and QVC was unable to serve its customers, which resulted in substantial lost sales and lost revenue.

4.    Upon information and belief, Defendant Beyrak, Resultly's founder and chief executive officer, specifically directed, participated in, and/or cooperated in Resultly's transmission of its Program on May 9–11, 2014.

5.    QVC seeks to recover damages from Defendants Resultly and Beyrak for the damage and loss caused by Resultly's deployment of its Program on the QVC website, causing damage to QVC's website, network, and web servers, and causing QVC to lose sales and revenue.

6.    Defendant VigLink participated in QVC's affiliate marketing program, under which VigLink could receive compensation for facilitating sales on QVC's website.  Under the agreements governing this relationship, VigLink was granted a non-transferable, non-sublicensable right to use specific, limited promotional materials and methods to access QVC's website.

7.    Defendant VigLink purported to sublicense its rights to Resultly, and recruited, encouraged, and permitted Resultly to access QVC's website using its robot Program, though the agreement prohibited sublicensing as well as the methods of access used by Resultly.

8.    QVC seeks to recover damages from Defendant VigLink for recruiting, encouraging, and permitting Resultly to transmit its Program, causing damage to QVC's website, network, and web servers, and causing QVC to lose sales and revenue.

## **THE PARTIES**

9.    QVC is a video and e-commerce retailer that offers a variety of products to millions of customers each day through broadcast, Internet, and mobile sales platforms.

10.    QVC is a Delaware Corporation with its principal place of business at 1200 Wilson Drive, West Chester, Pennsylvania 19380.

11.     Defendant, Resultly, LLC, is an Illinois Limited Liability Company that operates an online shopping application that utilizes a web crawling program to continuously crawl Internet shopping websites for the real-time prices of the websites' products.

12.     Resultly, LLC has its principal place of business at 350 East Dundee Road, Suite 200, Wheeling, Illinois 60090.

13.     Defendant Ilya Beyrak is an individual who resides in Chicago, Illinois.

14.     Defendant VigLink, Inc. ("VigLink") is a Delaware corporation, with its principal place of business at 539 Bryant Street, Suite 400, San Francisco, California 94107.  VigLink is engaged in the business of online affiliate marketing.

## JURISDICTION AND VENUE

15.     Through the conduct described herein, Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  QVC may pursue its CFAA claims against Defendants pursuant to 18 U.S.C. § 1030(g).

16.     Defendants caused and will cause QVC damages by overloading QVC's website, network, and web servers with its Program and preventing customers from accessing QVC's website; and by forcing QVC to regain control of its website, network, and web servers and prevent further transmission of the Program.

17.     This Court has jurisdiction over QVC's CFAA claims pursuant to 28 U.S.C. § 1331.

18.     This Court has supplemental jurisdiction over QVC's state-law claims pursuant to 28 U.S.C. § 1367 because these claims are related to and are part of the same case or controversy as QVC's CFAA claim.

19.     The Court has personal jurisdiction over Defendants, who have continuous and systematic contacts with the Commonwealth of Pennsylvania, have transacted business in or directed at the Commonwealth of Pennsylvania, engaged in tortious activity directed at entities and property located in the Commonwealth of Pennsylvania, and/or caused tortious harm or injury in the Commonwealth of Pennsylvania.   Among other things, Defendants have targeted wrongful acts at QVC, which is headquartered in Pennsylvania, and accessed and caused damage to QVC's web servers, which are located in Pennsylvania.

20.     Venue is proper in this District because a substantial part of the events giving rise to QVC's claims occurred in this District when Defendant Resultly transmitted its Program to QVC's website and intentionally caused damage by overloading QVC's website, network, and web servers.

## FACTS

## I.   Resultly's Excessive Crawling of QVC's Website Overloaded the QVC Website and Web Servers

21.     On or about May 9 through May 11, 2014, Resultly transmitted its Program, a robot web crawling program, to crawl QVC's retail website at an excessive rate, which had the effect of causing a denial of service attack on QVC's website.   The activity of Resultly's Program used, occupied, and diverted a significant amount of the processing resources of QVC's web servers, significantly reducing or eliminating QVC's ability to provide services to its customers through its website.

22.     Defendant Beyrak is the founder and CEO of Resultly.   Resultly has admitted that Beyrak was the person chiefly responsible for the operation of the company, that Beyrak was the person chiefly responsible for the creation, selection, use, incorporation and/or modification of

web-crawling software, and that Beyrak was the person chiefly responsible for Resultly's affiliate marketing relationships.

23.     Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's transmission of its Program to crawl QVC's website on May 9–11, 2014.

24.     Defendant Resultly configured its Program in a way that prevented QVC from identifying the Program as a web crawler, by either intentionally or negligently disguising the Program so that it appeared to reflect the activity of individual users using and sending search requests to QVC's website for information regarding QVC's products sold on the website.

25.     Defendant Resultly also configured its Program to cause several different Internet Protocol ("IP") addresses to be shown as the Program's source when network technicians attempted to trace the source of the Program, as opposed to the actual IP address from which the Program requests originated.  This configuration further obscured that the Program's search requests were coming from a web crawling program as opposed to individual users.

26.     Defendant Resultly also configured its Program in a way that it knew or should have known would bypass commonly deployed load-balancing techniques such that the Program directly accessed information from QVC's webservers.

27.     Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's configuration of the Program so as to disguise the Program so that it appeared to reflect the activity of individual users, to cause multiple different IP addresses to be shown as the Program's source, and to bypass commonly deployed load-balancing techniques.

28.     The Program bombarded QVC's website with search requests at rates ranging from 200-300 requests per minute to up to 36,000 requests per minute, which overloaded QVC's

website and prevented QVC from being able to serve its customers.  At one point the Program's crawling activity alone accounted for approximately 30% of the overall world wide web traffic being experienced by QVC.

29.     The rates of search requests from typical search engines are significantly lower than the rates at which Resultly's Program made requests on QVC's website, and the search requests themselves are configured in such a way as to interface with common load balancing techniques to reduce or eliminate stress on origin webservers.

30.     Resultly knew or should have known that its Program crawled at a rate per minute that was thousands of times more than standard industry practices.

31.     Resultly knew or should have known that the configuration of its Program did not follow commonly accepted web crawling protocols and practices in that it bypassed normal load balancing techniques and put stress on origin webservers.

32.     Upon information and belief, Resultly received error messages from the QVC site during the early stages of the Program's crawl, and otherwise knew or should have known that the Program was causing stress on the QVC network.  Resultly could have and should have modified its crawl to reduce the stress its Program was causing, but instead increased and/or maintained the intensity of the Program's crawl.

33.     Upon information and belief, Resultly obtained information regarding products sold on the QVC website as a result of the search requests sent by its Program to the QVC website on May 9–11, 2014.

34.     Because Defendant Resultly designed its Program in a manner that obscured detection—by disguising it to appear to be individual users and by masking its source IP

address—QVC's technicians were prevented from quickly identifying the source of the excessive requests and timely resolving the problem.

35.     The Program's excessive requests overloaded QVC's website, network, and web servers, which disrupted the functioning and operation of QVC's website, network, and web servers and caused significant interruptions in service to QVC's website, network, and web servers for many hours.  During this time, customers who attempted to view or make purchases on QVC's website were unable to do so, and QVC was unable to process customers' legitimate requests for purchases through the website.  QVC was therefore unable to serve its customers for many hours; this interruption of service resulted in lost sales and lost revenue for QVC.

36.     The Program's excessive requests affected one or more of QVC's computers, which are used in and affect interstate commerce and communication.

37.     The Program's excessive requests caused losses to QVC exceeding $5,000 in a one-year period.

## II.     VigLink Recruited, Encouraged, and Permitted Resultly to Access QVC's Website Using Resultly's Robot Web Crawling Program

### A.     Affiliate Marketing Programs

38.     Non-party Commission Junction, Inc. ("CJ"), now known as CJ Affiliate by Conversant, provides marketing services to internet retailers, like QVC.  Among other things, CJ facilitates "affiliate marketing programs" (or "performance marketing programs") sponsored by internet retailers.  Under these programs, operators of web sites and mobile applications ("Publishers") are eligible to receive a commission when, for example, a customer makes a purchase on the sponsor retailer's website as a result of an advertisement or other link on the Publisher's website.

39.     On June 26, 2002, QVC and CJ entered into a Commission Junction Advertiser Service Agreement ("Advertiser Agreement").  Pursuant to the Advertiser Agreement, CJ facilitates affiliate marketing programs sponsored by QVC.

40.     One way that CJ facilitates affiliate marketing programs is by assisting Publishers in enrolling in retailers' performance marketing programs.

**B.     VigLink Became a Publisher in QVC's Affiliate Marketing Program Through Its Publisher Agreements With QVC and CJ**

41.     Publishers wishing to participate in QVC's affiliate marketing program through CJ must apply on the CJ website and accept QVC's Publisher Agreement Terms and Conditions ("QVC Publisher Agreement") as well as the CJ Affiliate Publisher Service Agreement ("CJ Publisher Agreement").

42.     In or around May 2010, VigLink first applied to become a Publisher in QVC's affiliate marketing program and accepted the QVC Publisher Agreement and CJ Publisher Agreement in effect at that time.  On May 19, 2010, QVC accepted VigLink's application to become a Publisher in QVC's affiliate marketing program.

43.     The QVC Publisher Agreement and CJ Publisher Agreement have been modified and amended since May 19, 2010.  VigLink has accepted or is deemed to have accepted all such modifications and amendments in accordance with the relevant terms of each agreement.

44.     The QVC Publisher Agreement incorporates by reference certain of the CJ Publisher Agreement's terms.  Specifically, the QVC Publisher Agreement provides that Publishers may "access QVC's Website through links solely in accordance with the terms of [the QVC Publisher Agreement] and the [CJ Publisher Agreement]."  Further, the QVC Publisher Agreement conditions eligibility to be a QVC Publisher on membership in the CJ Network, implying acceptance of and compliance with the CJ Publisher Agreement.

45.     The CJ Publisher Agreement incorporates by reference certain of the QVC Publisher Agreement's terms.  Specifically, the CJ Publisher Agreement provides, "You agree to: . . . comply with the Advertisers' Program terms," and that "upon approval by the Advertiser for acceptance into its Program, you may display . . . Links to Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms and this Agreement."

46.     Under the CJ Publisher Agreement, VigLink received "the opportunity to earn Payouts by promoting Advertisers in accordance with the Advertiser's Program terms."

47.     The CJ Publisher Agreement provided the terms under which a Publisher (such as VigLink) could "drive traffic to another's Web site or Web site content" through its website or "other promotional methods" and earn compensation when those efforts resulted in transactions on the website of an Advertiser (such as QVC).  Each advertiser determined and defined the transactions that qualified for compensation.  Accordingly, VigLink's performance under the CJ Publisher Agreement was intended to benefit QVC and other Advertisers.

48.     Section 10.2 of the Advertiser Agreement between QVC and CJ expressly provides that QVC is "intended to benefit under each . . . Publisher's Publisher Service Agreement" with CJ.

### 1.     The Publisher Agreements Did Not Permit Sublicensing

49.     The QVC Publisher Agreement granted Publishers a non-transferable right to "access the QVC [website] through links solely in accordance with the terms of [the QVC Publisher Agreement] and the [CJ Publisher Agreement]."  The QVC Publisher Agreement expressly provided that that this grant was "without the right to sublicense."

50.     The CJ Publisher Agreement did not permit VigLink to sublicense its rights to access and use QVC's web site content, to otherwise grant such rights to any other entity, or to

authorize other entities to operate through VigLink's account with CJ.  Specifically, the CJ

Publisher Agreement provided that "An Advertiser's acceptance of You extends only to the

entity, or individual, that enters into this Agreement with CJ," and that "You represent and

warrant that: . . . You shall remain solely responsible for any and all Web sites owned and/or

operated by You and all of Your promotional methods."

### 2.   The Publisher Agreements Did Not Permit Collection of Information Through "Crawling" or "Scraping" Using Robot Software

51.   Under the QVC Publisher Agreement, in order to be eligible to be a QVC

Publisher, a Publisher's website "must not . . . contain or transmit any malicious or unsolicited

software," and must not "promote or link to other websites" that contain or transmit malicious or

unsolicited software.  VigLink specifically represented and warranted that it complied with these

requirements.

52.   Under the CJ Publisher Agreement, VigLink was permitted to access and use

QVC's website content only in the ways set forth in the Publisher Agreements.  Specifically, the

CJ Publisher Agreement provided that "[u]pon approval by the Advertiser for acceptance into its

Program, You may display . . . Links to Advertiser's Web site or Web site content in accordance

with the Advertiser's Program terms and this Agreement," that "you agree to: . . . comply with

the Advertisers' Program terms and this Agreement," and that "[f]or each Advertiser's Program

that You have been accepted to, the Advertiser is granting to You the right to display and Link to

the Advertiser's Web site or Web site content in accordance with the Advertiser's Program terms

for the limited purposes of Promoting the Advertiser's Program, subject to the terms and

conditions of this Agreement."

53.   Under the QVC Publisher Agreement, VigLink was permitted to "only use the

banner advertisements, button links, product information, QVC logos and text links to the

QVC.com website (or any mirror or successor site) . . . and/or other advertisements promoting

QVC products and events . . . that are provided to you by QVC through Commission Junction."

VigLink was specifically prohibited from using any promotional materials other than those

provided by QVC without first receiving written authorization from QVC.  VigLink specifically

represented and warranted that it complied with these requirements.

     54.    The CJ Publisher Agreement provided that VigLink "shall not cause any

Transactions to be made that are not in good faith, including, but not limited to, using any

device, program, robot, Iframes, or hidden frames."

     55.    The CJ Publisher Agreement further provided that "Your use of the Link signifies

Your agreement to refrain from copying . . . any icons, buttons, banners, graphics files or content

contained in the Link."  In the CJ Publisher Agreement, a "Link" is defined as an "Internet

connection."

### 3.    Under the Publisher Agreements, VigLink Was Responsible For All Usage and Activity on its Account

     56.    VigLink agreed in the CJ Publisher Agreement that it was responsible for all

usage and activity occurring on or through its account with CJ.  Specifically, the CJ Publisher

Agreement provided that "You shall be responsible for all usage and activity on Your account,"

and that "You represent and warrant that: . . . You shall remain solely responsible for any and all

Web sites owned and/or operated by You and all of Your promotional methods."

### 4.    The Publisher Agreements Required VigLink To Provide Accurate Information Regarding the Promotional Methods Used On Its Account

     57.    Under the CJ Publisher Agreement, VigLink agreed to provide QVC with

"accurate information about [VigLink] and [VigLink's] promotional methods, and to maintain

up-to-date 'Account' information (such as contact information, Web sites used, etc.)." VigLink

further agreed to "accurately, clearly and completely describe all promotional methods by

selecting the appropriate descriptions and providing additional information when necessary."

58.    The CJ Publisher Agreement provided that "Some promotional methods will be

designated by the system as 'special,'" and that "[s]pecial programs are linked to promotional

methods and practices considered unique and require manual approval and acceptance by the

Advertiser." VigLink agreed to designate its Account "as 'special' if [it] promote[d] an

Advertiser(s) by any means other than displaying a Link to the Advertiser on [its] Web site."

**C.    Resultly Used Its Program to Crawl the QVC Website While Acting as an**
**Agent of VigLink through VigLink's Account With CJ**

59.    Upon information and belief, VigLink operates as an "aggregator" of sub-

publishers seeking to participate in affiliate marketing programs like those sponsored by QVC.

That is, VigLink enters into agreements with sub-publishers, under which those sub-publishers

participate in affiliate marketing programs through an account established and held by VigLink.

60.    Under VigLink's agreement with Resultly, "VigLink will be the 'publisher of

record' for all Merchant affiliate programs."

61.    VigLink pays its sub-publishers a percentage of the commissions that VigLink

receives through an affiliate marketing program – such as QVC's – for transactions originating

from a sub-publisher's website, mobile application, or social networking page.

62.    VigLink retains a percentage of the commissions that VigLink receives through

an affiliate marketing program – such as QVC's – for transactions originating from a sub-

publisher's website, mobile application, or social networking page.

63.    Resultly claims to have been one of VigLink's sub-publishers in May 2014 and at

all other times relevant to QVC's Amended Complaint.

64.     Defendant Beyrak was the person chiefly responsible for Resultly's affiliate marketing relationships.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's decision to become one of VigLink's sub-publishers.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in the management of Resultly's sub-publishing relationship with VigLink.

65.     VigLink never informed QVC that it had enrolled Resultly as a sub-publisher on VigLink's account with CJ or in QVC's affiliate marketing program.

66.     Upon information and belief, VigLink recruited Resultly to be a sub-publisher for VigLink through its advertising and promotional messages, and encouraged Resultly to access QVC's website by offering Resultly an opportunity to share the commissions that VigLink receives from CJ through QVC's affiliate marketing program for qualifying transactions.

67.     VigLink advertises QVC as one of the retailers that participating Publishers can earn from in the "Merchant Explorer" section of the VigLink website (http://www.viglink.com/merchants/1256-qvc).  This "Merchant Explorer" section of the VigLink website also advertises the "Commissions Offered" by QVC under its affiliate marketing program.

68.     Resultly crawled the QVC website for the purpose of earning compensation through VigLink's account with CJ and enrollment in the QVC affiliate marketing program.

69.     VigLink benefited from Resultly's actions in crawling the QVC website because VigLink retained a percentage of any commissions paid on that account for qualifying transactions resulting from Resultly referrals.

70.     Resultly was acting through VigLink's account with CJ and as VigLink's agent when Resultly deployed its Program on May 9–11, 2014 to crawl the QVC website.

71.     Under the QVC Publisher Agreement and CJ Publisher Agreement, VigLink was responsible for Resultly's promotional methods and for Resultly's usage and activity on VigLink's account.

72.     Operating through VigLink's CJ Account, Resultly transmitted malicious and unsolicited software to the QVC website.

73.     By permitting Resultly to operate through VigLink's CJ Account and allowing and/or encouraging Resultly to use the Program to crawl QVC's website, VigLink caused transactions made by a device, program, or robot.

74.     Per the express terms of the CJ Publisher Agreement, transactions made using Resultly's Program – a "device, program, or robot" – were "not in good faith."

75.     By permitting Resultly to operate through VigLink's CJ Account and allowing and/or encouraging Resultly to crawl QVC's website with its Program, VigLink used promotional methods and materials other than those provided by QVC through CJ.

76.     VigLink granted Resultly an actual or *de facto* sublicense of its rights to use and access the QVC website, but never informed QVC that it had done so.

77.     VigLink did not provide QVC with clear, accurate, or complete information about the promotional methods used by its sub-publisher Resultly, the identities of VigLink's sub-publishers, including Resultly, or the websites, mobile applications, or social networking pages operated by VigLink's sub-publisher Resultly.  VigLink's failure to provide this information denied QVC the opportunity to review and reject Resultly's promotional methods.

78.     VigLink did not designate its promotional methods, including those employed by its sub-publisher Resultly, as "special" – though Resultly used "means other than displaying a

Link to [QVC]" on VigLink or Resultly's Web site.  VigLink's failure to make this required designation denied QVC the opportunity to review and reject Resultly's promotional methods.

### D.      Resultly Agreed to Be Bound By the QVC Publisher Agreement, CJ Publisher Agreement, and the QVC Website Terms of Use

79.     Resultly claims to be a sub-publisher of VigLink and claims to be a participant in QVC's marketing affiliate program by signing up for the program through VigLink.

80.     Resultly agreed to VigLink's Terms of Service in order to use VigLink's service and software.

81.     Resultly agreed that it would "comply with all rules, regulations and guidelines, as well as any applicable Merchant terms and conditions and policies. . . ."

## FIRST CLAIM FOR RELIEF

### Violation of the CFAA, 18 U.S.C. § 1030(a)(5)(A) (Resultly, Beyrak, and VigLink)

82.     QVC incorporates the allegations set forth in paragraphs 1 through 81 of the Amended Complaint as if fully rewritten herein.

83.     On or about May 9 through May 11, 2014, Defendant Resultly, acting as agent for VigLink, violated the CFAA when it knowingly transmitted its web crawling Program to QVC's website and intentionally caused damage by disguising its web crawler as individual online users, disguising its source IP address, and sending excessive requests to overload QVC's website and network.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

84.     As a direct result of Defendants' violation of the CFAA, QVC has sustained damages in a sum to be proven at trial and exceeding $5,000. Unless restrained and enjoined, Resultly and VigLink will continue to commit such acts and use the ill-gotten gains to their

pecuniary advantage and to QVC's detriment.  QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## SECOND CLAIM FOR RELIEF

### Violation of the CFAA, 18 U.S.C. § 1030(a)(5)(B) (Resultly, Beyrak, and VigLink)

85.     QVC incorporates the allegations set forth in paragraphs 1 through 84 of the Amended Complaint as if fully rewritten herein.

86.     On or about May 9 through May 11, 2014, Defendant Resultly, acting as agent for VigLink, violated the CFAA when it intentionally accessed QVC's website without authorization, and as a result of such conduct, recklessly caused damage by disguising its web crawler as individual online users, disguising its source IP address, and sending excessive requests to overload QVC's website and network.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

87.     As a direct result of Defendants' violation of the CFAA, QVC has sustained damages in a sum to be proven at trial and exceeding $5,000.  Unless restrained and enjoined, Resultly and VigLink will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment.  QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## THIRD CLAIM FOR RELIEF

### Violation of the CFAA, 18 U.S.C. § 1030(a)(5)(C) (Resultly, Beyrak and VigLink)

88.     QVC incorporates the allegations set forth in paragraphs 1 through 87 of the Amended Complaint as if fully rewritten herein.

89.     On or about May 9 through May 11, 2014, Defendant Resultly, acting as agent for VigLink, violated the CFAA when it intentionally accessed QVC's website without authorization, and as a result of such conduct, caused damage and loss by disguising its web crawler as individual online users, disguising its source IP address, and sending excessive requests to overload QVC's website and network.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

90.     As a direct result of Defendants' violation of the CFAA, QVC has sustained damages in a sum to be proven at trial and exceeding $5,000.  Unless restrained and enjoined, Resultly and VigLink will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment.  QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## FOURTH CLAIM FOR RELIEF

### Violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C) (Resultly, Beyrak, and VigLink)

91.     QVC incorporates the allegations set forth in paragraphs 1 through 90 of the Amended Complaint as if fully rewritten herein.

92.     On or about May 9 through May 11, 2014, Defendant Resultly, acting as agent for VigLink, violated the CFAA when it intentionally accessed QVC's website without authorization and/or in excess of authorized access, and thereby obtained information from QVC's website. Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

93.     As a direct result of Defendants' violation of the CFAA, QVC has sustained damages in a sum to be proven at trial and exceeding $5,000.  Unless restrained and enjoined,

Resultly and VigLink will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment. QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## FIFTH CLAIM FOR RELIEF

### Violation of the CFAA, 18 U.S.C. § 1030(a)(4)(Resultly, Beyrak, and VigLink)

94.     QVC incorporates the allegations set forth in paragraphs 1 through 93 of the Amended Complaint as if fully restated in this paragraph.

95.     On or about May 9 through May 11, 2014, Defendant Resultly, acting as agent for VigLink, violated the CFAA when it, knowingly and with intent to defraud, accessed the QVC website without authorization and/or in excess of authorized access, and thereby furthered its intended fraud and obtained information. Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

96.     Resultly acted with intent to defraud when it used its Program to access the QVC website because Resultly intended to violate the Publisher Agreements, including their prohibitions on accessing QVC's website using a device, program, or robot, and causing transactions using a device, program, or robot. Per the terms of the Publisher Agreements, such transactions were "not in good faith."

97.     Resultly furthered its intended fraud when it used its Program to access the QVC website because Resultly violated the Publisher Agreements, including their prohibitions on accessing QVC's website using a device, program, or robot, and causing transactions using a device, program, or robot.

98.    Resultly's transmission of its Program to the QVC website was wrongful and unlawful because it was in violation of the Publisher Agreements, including their prohibitions on accessing QVC's website using a device, program, or robot, and causing transactions using a device, program, or robot.

99.    The information obtained by Resultly as a result of the transmission of its Program on May 9-11, 2014 had value because it helped Resultly in its efforts to earn compensation through VigLink's account with CJ and enrollment in the QVC affiliate marketing program.

100.    As a direct result of Defendants' violation of the CFAA, QVC has sustained damages in a sum to be proven at trial and exceeding $5,000.  Unless restrained and enjoined, Resultly and VigLink will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment.  QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## SIXTH CLAIM FOR RELIEF

### Negligence (Resultly, Beyrak, and VigLink)

101.    QVC incorporates the allegations set forth in paragraphs 1 through 100 of the Amended Complaint as if fully restated in this paragraph.

102.    QVC pleads in the alternative that, at all times relevant to this matter, Resultly's Program was configured and designed to perform crawling activities that are well beyond the norms, bounds, and accepted practices in the industry.

103.    Resultly knew or should have known that an improper transmission of its Program could overload QVC's website and cause the QVC website to cease normal function, thereby rendering QVC unable to serve its customers through the website.

104.    Acting as agent for VigLink, Resultly failed to exercise due care and negligently operated its Program to send excessive requests for service that interfered with QVC's ability to use its website to service and provide products to its customers.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

105.    As a direct and proximate result of Defendants' negligence, QVC has suffered substantial damages.

106.    Defendants' negligence prevented QVC from using its website to service and provide products to QVC's customers and has caused QVC substantial injury, entitling QVC to compensatory damages.

## SEVENTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Economic Advantage
### (Resultly, Beyrak, and VigLink)

107.    QVC incorporates the allegations set forth in paragraphs 1 through 106 of the Amended Complaint as if fully restated in this paragraph.

108.    As described above, QVC services its customers through QVC's website and sells its products through its website.  QVC also obtains a substantial amount of its business through its website sales.

109.    QVC has a reasonable expectation of prospective contractual relationships with the customers who visit QVC's website and purchase products.

110.    Resultly purposefully and intentionally prevented QVC from servicing and providing products to its customers when Resultly, acting as an agent of VigLink, transmitted its

Program and overloaded QVC's website and network by disguising its web crawling Program as individual online users, disguising its source IP address, and sending excessive requests.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

111.    Resultly's transmission of its Program had no legitimate purpose or justification.

112.    Resultly's transmission of its Program was dishonest and outside of the accepted norms of behavior of affiliates, publishers and sub-publishers, and was performed to give Resultly and VigLink an unfair competitive advantage over other affiliates, publishers, and sub-publishers that do not use such dishonest means.

113.    As a direct and proximate result of Resultly's interference, QVC's sales from its website declined significantly and QVC suffered substantial damages.

114.    Unless Defendants are restrained by appropriate injunctive relief, Resultly's actions are likely to recur and will cause QVC irreparable injury for which there is no adequate remedy at law.

## EIGHTH CLAIM FOR RELIEF

### Conversion (Resultly, Beyrak, and VigLink)

115.    QVC incorporates the allegations set forth in paragraphs 1 through 114 of the Amended Complaint as if fully restated in this paragraph.

116.    At all times, QVC has retained all right, title, and interest in its website, www.qvc.com, and its network.

117.    Resultly, acting as agent for VigLink, knowingly, dishonestly, and/or intentionally deprived QVC of the ability to access and use its website to service and provide products to its customers when Resultly transmitted its Program and overloaded QVC's website

and network by disguising its web crawling Program as individual online users, disguising its source IP address, and sending excessive requests.  Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

118.    Resultly transmitted its Program without consent from QVC and without a lawful justification.

119.    By transmitting its Program and overloading the QVC website, Resultly intentionally and without authorization exercised dominion over QVC's website and web servers in denial of QVC's rights to that property.  This wrongful exercise of dominion deprived QVC of the legitimate use of its website and web servers.

120.    As a direct and proximate result of Resultly's conversion, QVC has suffered substantial damages.

121.    Resultly, and VigLink through Resultly, deprived QVC of the ability to access and use its website to service and provide products to QVC's customers when Resultly transmitted its Program and overloaded QVC's website and network.  These actions have caused QVC irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment. QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

## NINTH CLAIM FOR RELIEF

### Trespass to Chattels (Resultly, Beyrak, and VigLink)

122.    QVC incorporates the allegations set forth in paragraphs 1 through 121 of the Amended Complaint as if fully restated in this paragraph.

123.    At all times, QVC has maintained a possessory interest in its website and web servers, which are the personal property of QVC.

124.    Resultly, acting as agent for VigLink, for the benefit of Resultly and VigLink and without QVC's consent or authorization, intentionally accessed QVC's website and web servers by disguising Resultly's web crawling Program as individual online users, disguising its source IP address, and sending excessive search requests, causing an overload of the QVC website. Upon information and belief, Beyrak specifically directed, participated in, and/or cooperated in Resultly's actions.

125.    The activity of Resultly's program used, occupied, and diverted a significant amount of the processing resources of QVC's web servers, significantly reducing QVC's ability to provide services to its customers through its website.

126.    Through its actions, Resultly intentionally used, intermeddled with, and/or dispossessed QVC of QVC's website and web servers.

127.    Through its actions, Resultly impaired the quality, condition, and value of QVC's website and web servers.

128.    Through its actions, Resultly deprived QVC of its website and web servers for a substantial amount of time.

129.    Resultly's conduct constitutes trespass to chattels that has harmed QVC. VigLink is responsible for the conduct of Resultly. As a direct and proximate result of this conduct, QVC has suffered substantial damages.

130.    Resultly's interference with QVC's ability to use its website to service and provide products to QVC's customers when Resultly transmitted its Program and overloaded QVC's website and web servers has caused QVC irreparable injury. Unless restrained and

enjoined, Defendants will continue to commit such acts and use the ill-gotten gains to their pecuniary advantage and to QVC's detriment.  QVC's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling QVC to remedies including injunctive relief.

### TENTH CLAIM FOR RELIEF

**Breach of Contract – QVC Publisher Agreement –**
**Resultly's Use of Prohibited Promotional Methods (VigLink and Resultly)**

131.    QVC incorporates the allegations set forth in paragraphs 1 through 130 of the Amended Complaint as if fully restated in this paragraph.

132.    VigLink recruited, encouraged, and permitted Resultly to use and access QVC's website, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

133.    Resultly agreed to comply with all terms and conditions applicable to QVC's marketing affiliate program, including but not limited to the QVC Publisher Agreement and CJ Publisher Agreement.

134.    Per the terms of the QVC Publisher Agreement and CJ Publisher Agreement, VigLink was responsible for Resultly's promotional methods and for Resultly's usage and activity on VigLink's account.

135.    Resultly's use of and access to QVC's website was not in accordance with the terms of the QVC Publisher Agreement.  Resultly breached the QVC Publisher Agreement by transmitting malicious and unsolicited software to the QVC website, accessing QVC's website using a device, program, or robot, and causing transactions using a device, program, or robot, and using promotional methods and materials other than those provided by QVC through CJ.

136.    VigLink breached the QVC Publisher Agreement by recruiting, encouraging, and permitting Resultly's use of and access to QVC's website.

137.    VigLink breached the QVC Publisher Agreement by recruiting, encouraging, and permitting Resultly to transmit malicious and unsolicited software, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

138.    VigLink breached the QVC Publisher Agreement by recruiting, encouraging, and permitting Resultly to access QVC's website using a device, program, or robot, and to cause transactions using a device, program, or robot, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

139.    VigLink breached the QVC Publisher Agreement by recruiting, encouraging, and permitting Resultly to use promotional methods and materials other than those provided by QVC through CJ, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

140.    By recruiting, encouraging, and permitting Resultly to transmit malicious and unsolicited software and to use promotional methods and materials other than those provided by QVC through CJ, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement, VigLink breached its representations and warranties made in the QVC Publisher Agreement that it would not transmit any malicious or unsolicited software, and that it would not use promotional materials other than those provided by QVC.

141.    QVC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the QVC Publisher Agreement.

142.   As a direct result of VigLink's and Resultly's breaches of their contractual obligations, QVC has sustained general and special damages in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract – QVC Publisher Agreement – Sublicensing (VigLink)

143.   QVC incorporates the allegations set forth in paragraphs 1 through 142 of the Amended Complaint as if fully restated in this paragraph.

144.   VigLink granted Resultly an actual or *de facto* sublicense of its rights to use and access the QVC website, in breach of the QVC Publisher Agreement.

145.   QVC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the QVC Publisher Agreement.

146.   As a direct result of VigLink's breaches of its contractual obligations, QVC has sustained general and special damages in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF

### Breach of Contract – QVC Publisher Agreement – Failure to Identify Promotional Methods (VigLink and Resultly)

147.   QVC incorporates the allegations set forth in paragraphs 1 through 146 of the Amended Complaint as if fully restated in this paragraph.

148.   Resultly agreed to comply with all terms and conditions applicable to QVC's marketing affiliate program, including but not limited to the QVC Publisher Agreement and CJ Publisher Agreement.

149.   VigLink and Resultly violated the QVC Publisher Agreement by failing to provide QVC with clear, accurate, or complete information about the promotional methods used

by its sub-publisher Resultly, the identities of VigLink's sub-publishers, including Resultly, and the websites, mobile applications, or social networking pages operated by VigLink's sub-publisher Resultly.

150.    VigLink and Resultly violated the QVC Publisher Agreement by failing to designate as "special" VigLink's promotional methods, including those of its sub-publisher Resultly.

151.    QVC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the QVC Publisher Agreement.

152.    As a direct result of VigLink's and Resultly's breaches of their contractual obligations, QVC has sustained general and special damages in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF

**Breach of Contract – CJ Publisher Agreement -**
**Resultly's Use of Prohibited Promotional Methods (VigLink and Resultly)**

153.    QVC incorporates the allegations set forth in paragraphs 1 through 152 of the Amended Complaint as if fully restated in this paragraph.

154.    VigLink recruited, encouraged, and permitted Resultly to use and access QVC's website, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

155.    Resultly agreed to comply with all terms and conditions applicable to QVC's marketing affiliate program, including but not limited to the QVC Publisher Agreement and CJ Publisher Agreement.

156.    Per the terms of the CJ Publisher Agreement, VigLink was responsible for Resultly's promotional methods and for Resultly's usage and activity on VigLink's account.

157.    Resultly's use of and access to QVC's website was not in accordance with the terms of the CJ Publisher Agreement.  Resultly breached the CJ Publisher Agreement by transmitting malicious and unsolicited software to the QVC website, accessing QVC's website using a device, program, or robot, and causing transactions using a device, program, or robot, and using promotional methods and materials other than those provided by QVC through CJ.

158.    VigLink breached the CJ Publisher Agreement by recruiting, encouraging, and permitting Resultly's use of and access to QVC's website.

159.    VigLink breached the CJ Publisher Agreement by recruiting, encouraging, and permitting Resultly to transmit malicious and unsolicited software, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

160.    VigLink breached the CJ Publisher Agreement by recruiting, encouraging, and permitting Resultly to access QVC's website using a device, program, or robot, and to cause transactions using a device, program, or robot, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

161.    VigLink breached the CJ Publisher Agreement by recruiting, encouraging, and permitting Resultly to use promotional methods and materials other than those provided by QVC through CJ, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement.

162.    By recruiting, encouraging, and permitting Resultly to transmit malicious and unsolicited software and to use promotional methods and materials other than those provided by QVC through CJ, purportedly under rights granted to VigLink under the QVC Publisher Agreement and CJ Publisher Agreement, VigLink breached its representations and warranties made in the QVC Publisher Agreement that it would not transmit any malicious or unsolicited

software and that it would not use promotional materials other than those provided by QVC.  In breaching these representations and warranties, VigLink breached the CJ Publisher Agreement, which required compliance with the terms of the QVC Publisher Agreement.

163.    QVC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the QVC Publisher Agreement.

164.    In agreeing to the CJ Publisher Agreement, CJ, VigLink, and Resultly intended to benefit QVC.  This intent appears in the terms of the CJ Publisher Agreement, under which VigLink and Resultly could "promot[e] Advertisers" such as QVC and receive compensation when their promotional efforts resulted in qualifying "Transactions" benefiting the Advertiser.

165.    VigLink and Resultly intended to give QVC the benefit of their promotional efforts under the CJ Publisher Agreement.

166.    QVC is an intended third-party beneficiary of the CJ Publisher Agreement.  As such, QVC may enforce that agreement against a breaching party such as VigLink and Resultly.

167.    As a direct result of VigLink's and Resultly's breaches of their obligations under the CJ Publisher Agreement, QVC has sustained general and special damages in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF

### Breach of Contract – CJ Publisher Agreement– Sublicensing (VigLink)

168.    QVC incorporates the allegations set forth in paragraphs 1 through 167 of the Amended Complaint as if fully restated in this paragraph.

169.    VigLink granted Resultly an actual or *de facto* sublicense of its rights to use and access the QVC website, in breach of the CJ Publisher Agreement.

170.    In agreeing to the CJ Publisher Agreement, CJ and VigLink intended to benefit QVC. This intent appears in the terms of the CJ Publisher Agreement, under which VigLink could "promot[e] Advertisers" such as QVC and receive compensation when its promotional efforts resulted in qualifying "Transactions" benefiting the Advertiser.

171.    VigLink intended to give QVC the benefit of its promotional efforts under the CJ Publisher Agreement.

172.    QVC is an intended third-party beneficiary of the CJ Publisher Agreement.  As such, QVC may enforce that agreement against a breaching party such as VigLink.

173.    As a direct result of VigLink's breaches of its obligations under the CJ Publisher Agreement, QVC has sustained general and special damages in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF

### Breach of Contract – CJ Publisher Agreement -
### Failure to Identify Promotional Methods (VigLink and Resultly)

174.    QVC incorporates the allegations set forth in paragraphs 1 through 173 of the Amended Complaint as if fully restated in this paragraph.

175.    Resultly agreed to comply with all terms and conditions applicable to QVC's marketing affiliate program, including but not limited to the QVC Publisher Agreement and CJ Publisher Agreement.

176.    VigLink and Resultly violated the CJ Publisher Agreement by failing to provide QVC with clear, accurate, or complete information about the promotional methods used by VigLink's sub-publisher Resultly, the identities of VigLink's sub-publishers, including Resultly, and the websites, mobile applications, or social networking pages operated by VigLink's sub-publisher Resultly.

177.    VigLink and Resultly violated the CJ Publisher Agreement by failing to designate as "special" VigLink's promotional methods, including those of its sub-publisher Resultly.

178.    In agreeing to the CJ Publisher Agreement, CJ, VigLink, and Resultly intended to benefit QVC.  This intent appears in the terms of the CJ Publisher Agreement, under which VigLink and Resultly could "promot[e] Advertisers" such as QVC and receive compensation when their promotional efforts resulted in qualifying "Transactions" benefiting the Advertiser.

179.    VigLink and Resultly intended to give QVC the benefit of their promotional efforts under the CJ Publisher Agreement.

180.    QVC is an intended third-party beneficiary of the CJ Publisher Agreement.  As such, QVC may enforce that agreement against a breaching party such as VigLink and Resultly.

181.    As a direct result of VigLink's and Resultly's breaches of their obligations under the CJ Publisher Agreement, QVC has sustained general and special damages in an amount to be proven at trial.

## SIXTEENTH CLAIM FOR RELIEF

### Breach of Contract – QVC Publisher Agreement -
### Indemnification (VigLink)

182.    QVC incorporates the allegations set forth in paragraphs 1 through 181 of the Amended Complaint as if fully restated in this paragraph

183.    Under the QVC Publisher Agreement, VigLink is required to "indemnify, defend and hold harmless QVC . . . from any and all losses, liabilities, damages, actions, claims, expenses, and costs including, without limitation, reasonable attorneys' fees, which result or arise from or related to the development, operation, maintenance, and contents of your website or your negligence or breach of this Agreement."

184.    Resultly has asserted Counterclaims in this action alleging, *inter alia*, that it obtained rights to crawl the QVC website from VigLink, that QVC violated those rights by blocking Resultly from crawling the QVC website on May 11, 2014, and that QVC's decision to block Resultly constitutes fraudulent inducement, bad faith to third party beneficiaries, and a violation of the Lanham Act.

185.    VigLink was not granted permission to use robot software, such as the Program, to crawl the QVC site.  VigLink, and any entity, such as Resultly, claiming rights to access the QVC site through the VigLink account, was allowed to access the QVC site only as provided by the Publisher Agreements.  Resultly's deployment of the Program to crawl the QVC site was a violation of the Publisher Agreements, for which VigLink is responsible.

186.    Resultly's counterclaims arise from the operation of VigLink's website and VigLink's breach of the QVC Publisher Agreement.

187.    On May 7, 2015, QVC provided VigLink with written notice of its indemnification and defense obligations and requested confirmation that VigLink would honor those obligations.  On June 19, 2015, VigLink responded, denying that it has any indemnity obligations to QVC.

188.    QVC has performed all of the conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the QVC Publisher Agreement.

189.    As a direct result of VigLink's refusal to honor its indemnity obligations, QVC has sustained general and special damages in an amount to be proven at trial, including the amount of any judgment or settlement obtained by Resultly against QVC in this action, all costs of defense, including attorneys' fees and expert witness fees, incurred by QVC in defending

against Resultly's counterclaims; and all of QVC's costs, including attorneys' fees, associated with pursuing its indemnification rights against VigLink.

## **RELIEF REQUESTED**

WHEREFORE, QVC asks the Court to enter judgment:

(a)    awarding QVC a permanent injunction restraining Defendants Resultly and VigLink, their officers, agents, servants, and employees, and those in active concert or participation with any of them from further transmitting Resultly's Program to QVC's website and network, disguising the web crawling Program as individual online users, disguising its source IP address, and sending excessive requests to QVC's website;

(b)    awarding QVC a permanent injunction restraining Resultly from selling, divesting, licensing, distributing, transferring, removing, pledging, or otherwise disbursing any of Resultly's non-cash assets, including but not limited to, the Program; and

(c)    awarding QVC damages in the amount proven at trial for Defendants' violations of the CFAA; and

(d)    awarding QVC its attorneys' fees and costs; and

(e)    awarding QVC damages, restitution, interest, and costs on QVC's state-law claims; and

(f)    awarding such additional relief that the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, QVC hereby demands a jury trial on all issues so triable.


Dated: August 25, 2015

Chad A. Rutkowski (PA Bar No. 79860)
Erich M. Falke (PA Bar No. 85958)
M. Mitchell Oates (PA Bar No. 315691)
Baker & Hostetler LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891
Tel: 215-564-3100
Fax: 215-568-3439
crutkowski@bakerlaw.com
efalke@bakerlaw.com
moates@bakerlaw.com

Theodore J. Kobus III (PA Bar No. 73034)
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4200
Fax: (212) 589-4201
tkobus@bakerlaw.com

Randal L. Gainer (admitted *pro hac vice*)
Baker & Hostetler LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Tel: (206) 332-1381
Fax: (206) 624-7317
rgainer@bakerlaw.com

*Attorneys for Plaintiff QVC, Inc.*

**CERTIFICATE OF SERVICE**

I, Larry LaBella, certify that on August 25, 2015, I caused a true and correct copy of the

foregoing Amended Complaint to be served via e-mail and U.S. Mail on:

> Andrew Grosso
> Andrew Grosso & Associates
> 1101 Thirtieth Street NW, Suite 300
> Washington, DC 20007
> agrosso@acm.org
>
> David A. Cohen
> The Cullen Law Firm
> 1101 30th St. NW, Suite 300
> Washington, DC 20007
> dac@cullenlaw.com
>
> Arnon D. Siegel
> 299 W. 12th Street #10-K
> New York, NY 10014
> arnon.siegel@gmail.com

Larry LaBella